UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| CORBIN DALE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 20-324-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CITY OF PARIS, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Corbin Dale is a lineman for Defendant City of Paris, Kentucky's Electric Department (hereafter, "the City"). Dale's case concerns several disputes with his employer, beginning with his August 2019 suspension for failing to wear a long-sleeved shirt on the job. Dale asserts seven counts for relief and a variety of theories pertaining to those counts. The City, Co-Defendant Aaron Sparkman, and Co-Defendant Daron Jordan have moved for summary judgment on all counts. [Record No. 42]

After carefully considering the parties' filings, and for the reasons outlined below, most of Dale's claims will be dismissed. However, Dale has established prima facie cases for his: (a) Title VII racial discrimination claim premised on an April 2020 disciplinary incident (Count II); (b) Kentucky Civil Rights Act ("KCRA") racial discrimination claims premised on the April 2020 disciplinary incident and a 2021 promotional incident (Count IV); and (c) KCRA retaliation claim premised on the April 2020 disciplinary incident (Count V). Because the defendants only challenge the prima facie cases on these claims and the plaintiff has met his burden, these claims will not be dismissed.

## I. Background

### A. The City's Handbook

Dale, an African American, began his employment with the City in 2006. He has worked for the City's Electric Department since 2007. [Record No. 44, p. 110:5-7] All other relevant individuals discussed herein are white. Dale "signed and agreed to abide by the rules listed in the Employment Handbook when [he] was hired by the City of Paris." [Record No. 53-2, ¶ 3] As the name implies, this "Handbook," formally titled "Personnel Policies and Procedures," outlines the policies and procedures applicable to employees of the City concerning a number of issues. [Record No. 53-3]

The pending motion implicates several provisions of the Handbook. The Foreword provides a "Disclaimer," which reads, in full:

> None of the information included in these policies and procedures is intended to represent a contract of any kind with the City, either for employment or for any specific thing addressed in these policies and procedures. These policies and procedures, including and part of them, may be changed by the City Commission without advance notice. Absent a written contract approved by the City Commission or a law to the contrary, all City employment is "at will," and so either the City or the employee may end the employment relationship at any time, with or without cause, regardless of any provisions in these policies and procedures to the contrary. The City may change, forego or deviate from these policies and procedures, or any provision within, at any time and for any reason.

[Record No. 53-3, p. 4] This provision effectively makes Dale an at-will employee. Part I(1) provides that, "[i]n the event that approved departmental rules and regulations (*i.e.*, public safety departmental operating procedures) differ from these policies and procedures, the departmental rules and regulations shall supersede these policies and procedures to the extent of the differences." [Record No. 53-3, p. 5.]

Part I(5) states that, "[t]he City Manager is the Chief Administrative Officer of the city, overseeing personnel and other administrative functions under guidance of the Commission" but "all recommendations for employment, demotion, and permanent transfer, suspension without pay or dismissal shall be presented to the City Commission for approval as the appointing authority."  [Record No. 53-3, p. 6]  Part III(2) establishes guidelines for disciplinary actions, similarly providing that department heads may request suspensions without pay but that they "must be approved by the City Commission." [*Id.* at p. 12.]

Finally, Part II of the Handbook outlines the procedures for filling vacancies.  Part II(1)(c) states:

> All vacancies shall be announced both internally and externally . . . .  In the event there are two or more qualified candidates who are otherwise equally qualified, prior service to the City (as in the case of applicants seeking a transfer or promotion) may be considered as a "tie breaker" in determining which candidate is most qualified.

[*Id.* at p. 7.]  Part II(2)(a)(1) requires the city manager to "notify current employees of [a] vacancy by posting announcements . . . ." [*Id.*]  Part II(2)(a)(2) states that "[e]mployees may respond to such announcements by presenting a completed Internal Application Form to the Human Resources Director, thus indicating the employee's interest in the vacant position." [*Id.*]  Internal and external candidates for vacancies are evaluated "on the basis of one or more" criteria, which may include, as relevant here, personal interviews.  [*Id.* at p. 8.]

The Handbook requires all Employment Application Forms for qualified internal and external applicants to be forwarded to the human resources director.  [*Id.*]  The human resources director and city manager are entitled to conduct additional background investigations. [*Id.*]  Ultimately, the city commission holds the authority to appoint individuals

to vacancies, although the Handbook permits the commission to delegate this authority to the city manager to the extent allowed by law. [*Id.*]

## B. Disciplinary Incidents

Defendant Aaron Sparkman is Dale's supervisor as superintendent of the City's Electric Department. [Record No. 44, pp. 53:17-19.] Defendant Daron Jordan, who served as Paris's city manager from 2017 through August 1, 2021, was Sparkman's superior. [*See* Record No. 52, pp. 17:2-20:24.] Erin Morton has been the City's human resources director since 2010. [Record No. 51, p. 8:15-20]

In September of 2018, the Electric Department issued "Electric Department Rules and Guidelines for Safe Work Practices," a new policy ("the Policy"), which Dale acknowledged with his signature. [Record No. 44, p. 68:3-16] The Policy sets safety protocols for engaging in "hot work" on electrical apparatuses. [Record No. 53-5] The Policy provides "consequences" for violation of its terms, including a one-day suspension without pay for an employee's first violation. [*Id.* at p. 2.]

Sparkman disciplined Dale under the Policy for failing to wear a long-sleeved shirt while working on July 15, 2019, and July 17, 2019. [*See, e.g.*, Record No. 44, pp. 87:18-96:6.] On August 9, 2019, Sparkman issued a Corrective Action Form suspending Dale for one day without pay for these July 2019 infractions, which the document describes as: "Two occasions of failure to wear appropriate PPE (long sleeve shirt) while in the bucket working energized conductor, both Primary and Secondary." [Record Nos. 42-3 and 43, pp. 55:24-56:13]

Dale's affidavit offered in response to the pending motion indicates that he "personally witnessed other white City employees violate the . . . Policy and they were not disciplined in accordance with the policy." [Record No. 53-2, ¶ 6] During his deposition, Dale recalled only

one such incident on July 16, 2019, during which Sparkman himself allegedly violated the Policy. [Record No. 44, p. 97:8-25] Dale indicated that he did not report that incident to Jordan or other City personnel and that he was not aware of whether other City employees, learned of the incident, apart from fellow lineman Josh Hunt, who was also present. [*Id.* at p. 98:10-21.]

Dale later retained counsel, who composed a December 19, 2019, letter purporting to be a grievance. [Record No. 53-7] This letter contended, *inter alia*, that the Policy was at odds with the Handbook and that Dale did not actually violate the Policy on July 15 or July 17, 2019. [*Id.* at p. 3.] It did not, however, claim that the suspension was discriminatory. [*See id.*] Jordan responded to the letter, upholding the suspension without pay and citing Part I(1) of the Handbook which, as described above, expressly allows public safety departmental operating procedures to supersede other Handbook provisions.[1] [Record No. 53-8, p. 2]

When asked why Dale needed to wear a long-sleeved shirt during his work on the days in question, Sparkman testified during his deposition that it was a common safe work practice to wear such a shirt as a part of an employee's personal protective equipment ("PPE"). [Record No. 43, pp. 39:14-42: 20] Sparkman indicated that the failure to wear long-sleeved shirts was "a violation of our standard operating and understood work practices just for electric utilities" but admitted that neither July 2019 incident actually violated the Policy. [*Id.* at pp. 41:23-43:20; 54:3-55:9.] After testifying to this point, Sparkman agreed that the decision to suspend Dale without pay violated the Handbook and further stated that he took such action "[b]ecause [he] felt that the violation, after determining that it was enough of a safety

---

[1] The letter is undated but plaintiff's counsel asserts that Jordan did not respond until "late January" of 2020. [Record No. 53, p. 6]

infraction, warranted a day off without pay." [*Id.* at pp. 55:19-56:13.] He also testified that he has not suspended any other employee during his time working for the City. [*Id.* at p. 56:14-21.]

Dale was involved in another incident the following spring. An April 17, 2020 disciplinary letter states as follows:

> 1. As you know, [o]n April 14, 2020 the bucket lift was operated on the job. Following the work being completed, the vehicle walk around was failed to be performed [*sic*] and the bucket was not lowered into the proper storage position before driving. While returning to the office the bucket made contact with the Railroad Overpass on Main Street causing considerable damage to the equipment.
> 2. On the same day April 14th, 2020 groundsman [Travis] Noel was permitted to operate the lift and perform overhead duties he was not been properly trained to complete. Putting himself at risk for injury.
> 3. In August of 2019 you received a one-day suspension for safety violations that were observed on the job.

[Record No. 42-7] Dale testified that Noel used the truck's boom to fix a security light, even though he could not recall who made the decision to allow him to do so, and the plaintiff further indicated that he had done similar work when he worked as a groundsman earlier in his career with the Electric Department. [Record No. 44, pp. 102:22-104:5] The plaintiff agreed that he "had seen Travis operate the boom to the extent that [he] believed [Noel] knew how to operate it effectively" prior to the April 14, 2020 incident. [*Id.* at p. 104:15-20.] Dale also noted that Noel was driving the truck with the boom on the job and that he had been following in a different vehicle. [*Id.* at p. 101:7-21.] Noel had been working for the Electric Department for approximately three months at the time of the incident. [Record No. 43, p. 62:8-13]

The plaintiff acknowledged that the responsibility to ensure that a truck boom is secure for travel "kind of falls on anybody who's on the job site," even though he testified that he was not Noel's supervisor. [Record No. 44, pp. 105:14-106:11.] Sparkman offered similar

testimony, indicating that linemen, like Dale, are not *per se* supervisors of groundsmen like Noel, but that they can give groundsmen responsibilities on a job and would be "in charge of the job" if no foreman or superintendent were present. [Record No. 43, p. 16:4-19:7]

In response to this incident, the City issued a "Last Chance Agreement" acknowledged by Dale, Sparkman, and Morton, which imposed conditions for the plaintiff's continued employment, including a 12-month term of probation during which "any additional safety violations [would] be considered grounds for termination." [Record No. 42-7, p. 2]

Noel was also reprimanded for this incident. He received only a "written warning for inefficiency, neglect or mishandling of equipment, and inattention resulting in the damage to the Bucket truck." [Record No. 53-9] This appears to have been premised on the fact that it was his "first disciplinary action." [*Id.*]

Sparkman testified that he had "written up" Electric Department employees a total of five times as superintendent, the July 2019 incident involving Dale and April 2020 incident involving Dale and Noel comprising three of these write-ups. [*Id.* at pp. 67:2-69:15.] Sparkman recalled the details of the two other disciplinary write-ups, which involved Matthew Kelly and Andrew Steele causing truck accidents while backing out of garages. [*Id.* at pp. 69:16-70:16.]

### C. Electric Department Promotions

A significant portion of Dale's lawsuit concerns the Electric Department's promotion practices when filling vacancies. Dale contends that the Electric Department did not follow the vacancy-filling procedures of the Handbook and, "instead[,] promoted other white males based on their seniority . . . ." [Record No. 53, p. 7] Morton testified during her deposition that she believed "there have been times in the past when" prior service to the City "[wa]s the

only consideration" for promotions but that the City has not considered "seniority only" since she began her employment as human resources director. [Record No. 46, pp. 70:17-71:2, 74:2-8]

Sparkman was initially hired around the same time as fellow Electric Department employee Aaron Biddle in 2005, giving both men seniority over Dale. [Record No. 43, p. 14:2-10] Sparkman was involved in one disciplinary incident in 2007, four incidents in 2008, and one incident in 2010. [*See* Record No. 53-4] Five of these incidents concerned truck or equipment-related accidents on the job, while one 2008 incident involved Sparkman leaving his phone on silent so that he could not respond to a "trouble call." [*Id.*]

Sparkman was promoted from lineman to foreman in 2011 or 2012 after interviewing for the position. [*Id.* at pp. 20:15-24:14] Another lineman, Wally Hunsinger, had seniority over Sparkman and also interviewed for the position. [*Id.*] Sparkman served as acting superintendent when the former Electric Department superintendent, Steve Sexton, retired in 2017, and was permanently promoted to superintendent in 2018 after an interview. [*Id.* at pp. 24:15-26:9.] Sparkman indicated that he did not have to formally submit applications for either promotion, although he believed that "there would have been a job posting" for the foreman position. [*Id.* at pp. 23:2-12, 26:13-15.]

Biddle would eventually become crew chief, a position above lineman, but Morton testified that she could not recall whether a vacancy for crew chief was formally posted. [Record No. 46, p. 35:17-20] Dale contends in his affidavit that he was qualified for the position but was not given the opportunity to apply. [Record No. 53-2, ¶¶ 12, 14] Dale also states that the defendants failed to produce any documentation related to Biddle's promotion in response to a request for production, further indicating that the City did not follow the

Handbook's formal protocols for posting and filling vacancies when Biddle was promoted to crew chief.  [Record No. 53, p. 8 n. 9]

After Sparkman became superintendent in 2018, he promoted Biddle from the position of crew chief to his former position of foreman, which is directly below superintendent. [Record No. 43, pp. 30:23-31:23]  Sparkman testified that he was responsible for this promotion, there was no formal application process, and the Handbook's vacancy-filling procedures were not followed "[b]ecause [Biddle] was the most qualified person for the position and because [Sparkman] had spoken to the other employees and we had basically all come to the same consensus there was no need to put the posting out."  [*Id.* at pp. 34:5-37:9.] Sparkman indicated that Biddle's seniority also was considered.  [*Id.* at pp. 37:10-20.]  Dale testified that employees did not object to Biddle's promotion in 2018 when Sparkman asked their opinions "because [Biddle] was the next senior man at that time so it was just kind of a natural progression."  [Record No. 44, p. 66:13-25]

Biddle's promotion left the crew chief position vacant, and according to Sparkman, Dale was the next most-senior employee.  [Record No. 43, p. 33:19-33.]  But the position was not filled, and Sparkman "with maybe some input from Aaron Biddle as Foreman" instead eliminated the position.  [*Id.* at p. 32:6-10.]

Biddle died in early 2020, and the foreman position was left vacant for approximately one year.  [*See* Record Nos. 44, pp. 38:3-6, 60:1-2, and 45, pp. 96:24-97:12.]  In late January or early February 2021, Sparkman posted the job vacancy internally, and three candidates, Dale, Steele, and Hunt, applied through a formal application process, which included an interview.  [Record Nos. 43, p. 72:18-21, and 53-10]  Hunt had worked for the Electric Department since 2010, and Steele was hired in 2016. [Record No. 43, pp. 72:12-73:19]  All

served as Class A linemen, although Dale had the longest tenure in this position.  [*Id.* at 71:21-74:13.]

Sparkman conferred with Morton and Assistant City Manager Mike Withrow, who were present for the interviews, prior to making the decision to hire Steele.  [*Id.* at pp. 92:14-19, 96:1-6.]  Morton stated in her deposition that she wrote Sparkman's recommendation to promote Steele, which was tendered to the city commission.  [Record No. 46, p. 59:17-60:5] According to Morton, Steele was better qualified for the foreman position based on his interview answers documenting his work experience prior to joining the Electric Department, which included supervisory roles.  [*Id.* at pp. 60:13-63:15.]  She also indicated that the interview panel did not consider the candidates' personnel or training files as a part of the interview process.  [*Id.* at p. 62:8-64:24.]

Sparkman testified that he had hired a total of six Electric Department employees as superintendent and given two promotions (to Biddle and Steele).   [Record No. 43, pp. 28:1-29:5.]  He "assumed" that all of these individuals were Caucasian.  [*Id.* at pp. 28:22-29:5.]

### D.  Use of Racial Slurs within the Electric Department

Dale alleges in his First Amended Complaint that Sparkman allowed him to be exposed to racist statements concerning African Americans, as well as individuals of Middle Eastern or Indian descent, made by Electric Department crew members and that such statements were made in the presence of the superintendent.  [Record No. 30, ¶¶ 41-43]  During his deposition, Dale recalled one incident in which Biddle referred to a member of the public walking down the street in a predominantly African American neighborhood as a "jigaboo," but testified that he was the only other employee present, did not tell Biddle that the remark was inappropriate,

and did not report Biddle's use of the slur to "anyone else at the City." [Record No. 44, 59:4-60:13.]

Dale also recalled a separate discussion in the office about "the things that were going on in Afghanistan," during which someone said, "we just need to kill all those towel heads or . . . rag heads." [*Id.* at 64:6-12.] He did not remember who made this comment or whether Sparkman or any other specific employees were present. [*Id.* at 64:11-22.] He did not inform the speaker that this remark made him uncomfortable and did not report it to Sparkman or any other City official. [*Id.* at 64:23-65:7.] Indeed, Dale testified that he never submitted any internal grievance or complaint regarding racist remarks made on the job "because none of those attacks were [directed] towards [him] . . . ." [*Id.* at 57:24-58:5.]

Sparkman testified that he had heard white Electric Department employee Brenten Amyx make an unspecified racist remark after this action had already been filed. [Record No. 43, pp. 86:3-89:10] Sparkman stated that he spoke with Amyx and told him not to use the term again and that he believed Amyx did not understand the word or its meaning prior to this conversation. [*Id.* at p. 86:16-24.] Sparkman also testified that had heard Dale use the term "hood rat" in March 2021, but did not speak with him about using that term because "[p]er this lawsuit and the terminology used in the lawsuit, I figured Corbin probably knew the terms that he should use and not use." [*Id.* at pp. 90:11-92:2.] Dale denied that he had ever used such a term during his deposition. [Record No. 44, p. 62:4-8]

Sparkman acknowledged that he has the responsibility to speak with Electric Department employees when they use derogatory language. [Record No. 43, p. 92:1-9] Morton stated that the City has not received any complaints about the use of racial slurs during her time as human resources director. [Record No. 46, pp. 69:19-70:5]

- 11 -

### E.  Dale's Symptoms of Distress and Professional Relationships

Dale noted during his deposition that he had experienced anxiety, loss of sleep, and a general sense of worry that he attributed to the alleged discriminatory and retaliatory practices of the City.  [Record No. 44, p. 44:3-13]  He specifically testified that these conditions have existed since 2018 or 2019.  [*Id.* at p. 52:3-13.]  He does not take medications for these conditions but has seen Dr. Tripp, a therapist with the Lexington Department of Veteran's Affairs facility.  [*Id.* at pp. 44:14-53:16.]

Dale described his relationship with Sparkman as "professional," noting that "we work in a capacity where we get things done," even though their relationship was better when they first began to work together than it is now.  [*Id.* at pp. 53:23-25, 55:2-14.]  The plaintiff agreed that he does not have a bad relationship with other coworkers in the Electric Department, indicating that "we all work together, [and] we get along."  [*Id.* at pp. 99:1-100:3.]

### F.  Procedural History

Dale filed a March 20, 2020, Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), primarily contesting the August 9, 2019, suspension without pay and asserting that Sparkman arbitrarily enforced the Policy against him but not his Caucasian coworkers.  [Record No. 42-9]  He noted that the City is aware of crew members committing "far more egregious acts" without punishing them and also stated that "[he] has been subject to hearing members of his crew make derogatory racial comment[s] on multiple occasions."  [*Id.* at p. 3.]  He requested that the EEOC accept his factual recitation "as a charge of discrimination" and requested a right-to-sue letter.  [*Id.*]

After receiving a right-to-sue letter on April 29, 2020, Dale filed this action on July 28, 2020, asserting various claims against the three defendants.  [Record No. 1, ¶ 12]  The original

Complaint included allegations regarding the July-August 2019 disciplinary incident relating to the Policy, the April 2020 disciplinary incident, and racial slurs made by Electric Department employees.  [*See*, *e.g.*, *id.* at ¶¶ 19-61.]  It did not contain allegations regarding the Electric Department's purportedly discriminatory promotional practices.

The defendants filed a motion for judgment on the pleadings on October 21, 2020, which the Court addressed in a December 22, 2020, Memorandum Opinion and Order. [Record Nos. 10 and 20]  The Court granted the motion, in part, leaving intact the plaintiff's claims against the City for violations of § 1981, Title VII, and the KCRA, as well as his tort claims against the City, Sparkman, and Jordan (in their individual capacities).  [Record No. 20, p. 14]

Dale then filed a motion for leave to file an amended complaint on April 5, 2021, seeking to add Withrow and Morton as defendants and allege claims premised on the City's failure to promote him to crew chief in 2018 and foreman in 2021.  [Record Nos. 24 and 24-1] The Court granted Dale's motion on a limited basis in a June 1, 2021, Memorandum Opinion and Order, concluding as follows:

> Dale will be permitted to amend the Complaint to add the proposed allegations concerning the recent foreman position to his procedural due process and racial discrimination claims. However, any allegations related to the crew-chief promotion are time-barred, and he will not be permitted to rely upon or add them.[2]  Additionally, good cause does not justify extending the deadline in the Scheduling Order to permit Dale to add additional parties.

[Record No. 28]

---

[2] Thus, while evidence concerning the 2018 promotional issues may be relevant to the Electric Department's historical vacancy-filling practices (discussed below), Dale does not maintain affirmative claims for being denied a promotion in 2018.

Dale currently maintains the following specific counts in his First Amended Complaint: (I) "Racial Discrimination, Racial Harassment (Hostile Work Environment), Retaliation" under 42 U.S.C. § 1981 against the City; (II) "Racial Discrimination" in violation of Title VII of the Civil Rights Act of 1964 against the City; (III) violation of his procedural due process right in a promotion to foreman under 42 U.S.C. § 1983 against the City;[3] (IV) "Racial Discrimination" in violation of the KCRA against the City; (V) "Retaliation" under the KCRA against the City; (VI) negligent hiring, retention, and supervision against all defendants; and (VII) negligent infliction of emotional distress ("NIED") against all defendants. [*See* Record Nos. 28 and 30]  The defendants have moved for summary judgment on all counts. [Record No. 42]

## II.  Legal Standard

Summary judgment is appropriate if there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the jury could render a verdict in its favor.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

---

[3]  Count III is confusing inasmuch as it purports to proceed against "ALL DEFENDANTS," but only makes substantive allegations against the "CITY."  [Record No. 30, ¶¶ 96-99]  The Court will construe the count to proceed only against the City, but this discrepancy does not affect the analysis regarding this claim.

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

### III. Analysis

### A. Section 1981 Claims (Count I)

The defendants contend that the § 1981 claims contained in Count I fail because Dale has not established that he has an employment contract with the City. [Record No. 42, p. 10] Dale responds that the scope of § 1981 is sufficiently broad to encompass at-will employment relationships and that his § 1981 claims do not fail because he had an implied contract with the city. [Record No. 53, pp. 10-11] The City replies by arguing that § 1981 requires proof of the existence of a contract as defined by state law and that KRS § 83A.150, unlike the common law, only authorizes the City to enter into written contracts that are signed by the mayor. [Record No. 56, pp. 1-2]

Title 42 of United States Code, section 1981(a), provides that "[a]ll persons within the jurisdiction of the United States have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." "For purposes of [§ 1981], the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' . . . under which the plaintiff has

- 15 -

rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (citing 42 U.S.C. § 1981(b)).

Dale quotes *Burton v. Plastics Research Corp.* for the proposition that "the great weight of well-reasoned authority supports [the] conclusion that the employment-at-will relationship encompasses sufficient contractual rights to support section 1981 claims for wrongful termination." 134 F. Supp. 2d 881, 886-87 (E.D. Mich. 2001) (alteration in original) (collecting cases). But the *Burton* court, as well as other courts within this circuit, have looked to state law to determine whether "at-will employment relationships are sufficiently contractual" to support § 1981 claims. *Id.* at 887 (applying Michigan law); *accord Henry v. Trammell Crow SE, Inc.*, 34 F. Supp. 2d 629, 636 (W.D. Tenn. 1998) (applying Tennessee law); *Williams v. Utd. Dairy Farmers*, 20 F. Supp. 2d 1193, 1202 (S.D. Ohio 1998) (applying Ohio law). The United States Court of Appeals for the Sixth Circuit has also endorsed this practice. *See Aquino v. Honda of Am., Inc.*, 158 F. App'x 667, 674 n. 3 (6th Cir. 2005). Accordingly, the Court turns to Kentucky law, starting with the statutory provision cited by the City.

KRS § 83A.150, among other statutes, provides governmental structure to Kentucky cities, such as Paris, operating under a "city manager plan." *See* KRS § 83A.150(1). The City's allusion to the statute apparently refers to KRS § 83A.150(9), which states, in relevant part, as follows: "[A]ll bonds, notes, contracts, and written obligations of the city according to ordinance or resolution shall be made and executed by the mayor on behalf of the city." The qualifying language, "according to ordinance or resolution," accords with the plaintiff's employment relationship because the City's ordinances require that he be appointed as an at-will employee subject to the Handbook. *See* Paris, Ky., Code of Ordinances § 21.001

(2018). Thus, the face of the statute supports the City's assertion that Dale cannot have a contractual relationship with the City unless the mayor made and executed an employment contract.[4] And there is no evidence that the mayor did make and execute an employment contract with Dale on the City's behalf.

Only one case has interpreted this specific portion of the statute and it generally lends support to the City's argument. *See Dearborn v. Cty. of Frankfort*, No. 2014-CA-001801-MR, 2016 WL 7175265 (Ky. Ct. App. Dec. 9, 2016) (unpublished). In *Dearborn*, Defendant City of Frankfort admitted that "Conditions of Employment" forms, which were signed by the plaintiff police officers but not the mayor, constituted written contracts. *Id.* at *1-2. Still, the Court of Appeals declined to construe these documents to include an implied term guaranteeing educational incentives Frankfort offered to the officers during their recruitment. *Id.* at *1-4. In doing so, the court endorsed the City's view in this case that all contracts in a "city manager plan" city must be made and executed by the mayor under KRS § 83A.150. *Id.* at *3-4. The court reasoned that this is the correct interpretation of the statute because, while "a city may properly enter into contracts, [it] is constrained in the method by which it may do so according to the statutes that govern it." *Id.* at *4 (citing KRS § 82.082(1)).

Although the opinion's analysis is somewhat contorted, the upshot is that the officers could not "establish any contractual right," including their alleged implied contractual right, "to be paid education incentive[s]" because no contract securing such an incentive was made and executed by the mayor. *Id.* at *3-5. Thus, what little authority exists on the matter

---

[4] The City does have a mayor [*see* Record No. 53-9], but Dale does not challenge his conduct in this litigation.

indicates that Dale cannot establish a contractual relationship under Kentucky law because the mayor would have been required to make and execute such a contract.[5]

Additionally, Dale only asserts that he had an implied contract with the City, and relevant caselaw indicates that an implied contract did not exist. The plaintiffs in *Furtula v. Univ. of Kentucky* "were employed for several years by the University of Kentucky" and claimed that the university "breached contractual obligations to provide them with benefits under [] long-term disability compensation" programs governed by several documents, including a "Staff Handbook" that was "provided to employees who sign an acknowledgement of having received it." 438 S.W.3d 303, 305-306 (Ky. 2014). The "Staff Handbook" included a familiar disclaimer: "THIS HANDBOOK IS NOT A CONTRACT. THE EMPLOYEES OF THE UNIVERSITY ARE 'AT WILL' EMPLOYEES AND ARE SUBJECT TO LAY–OFF OR TERMINATION IN ACCORDANCE WITH UNIVERSITY POLICIES AND PROCEDURES." *Id.* at 309. The other documents governing the program likewise

---

[5] The City's reliance on this statute to demonstrate that no contractual relationship could have existed may seem unusual at first glance, but it is rooted in longstanding rules of municipal corporations law. "The statutory provisions concerning the formation of a contract by a municipality must be strictly adhered to." *Cty. of Greenup v. Pub. Serv. Comm'n*, 182 S.W.3d 535, 540 (Ky. Ct. App. 2005). And "[a] contract which [a] city has no [statutory] authority to make is void and cannot be made valid by merely treating it so." *Epic Mach., LLC v. Cty. of Morgantown*, No. 2007-CA-001781-MR, 2009 WL 2192230, at *3 (Ky. Ct. App. July 24, 2009) (unpublished) (citing *Walker v. Cty. of Richmond*, 262 S.W. 628, 629 (Ky. 1924)). It follows that "[t]he persons who contract with municipal corporations must, at their peril, know the rights and powers of the officers of such municipalities to make contracts and the manner in which they must make them." *Cty. of Greenup*, 182 S.W.3d at 540 (quoting *Cty. of Princeton v. Princeton Elec. Light & Power Co.*, 179 S.W. 1074, 1079 (1915)). "[A]ny other rule would destroy all the restrictions which are thrown around the people of municipalities for their protection by the statute laws . . . and would render abortive all such provisions. The rule in certain instances may be harsh, but no other is practical." *Dolt, Thompson, Shepherd & Conway, P.S.C. v. Commonwealth ex rel. Landrum*, 607 S.W.3d 683, 687 (Ky. 2017) (quoting *Cty. of Princeton*, 179 S.W. at 1079 (1915)).

- 18 -

disclaimed a "contract of employment" and reserved the right "to modify or change, and to abolish or consolidate any of these programs." *Id.* at 309.

Applying "[b]asic contract law," the Supreme Court of Kentucky observed that, "as in the case of an express contract, an implied contract requires the agreement of the promisor to be bound." *Id.* at 308. "To constitute such a contract there must, of course, be a mutual assent by the parties—a meeting of minds—and also an intentional manifestation of such assent." *Id.* (emphasis omitted) (quoting *Kellum v. Browning's Adm'r*, 21 S.W.2d 459, 463 (1929)). The "clear and unequivocal disclaimers of contractual intent along with express reservations of the authority to alter and amend the disability policies at any time ma[de] it obvious to employees and prospective employees" that the university did not intend to bind itself to providing the programs. *Id.* at 309. "This clear and convincing evidence negating the existence of contractual assent, and clearly communicating that intent to prospective and current employees, preclud[ed] [the court] from inferring the existence of an implied contract." *Id.* at 309-310. The same principles apply here.

Dale admits that he received and signed a copy of the Handbook, which included the at-will employment Disclaimer that manifests the City's intent that it not be bound to an employment contract or committed to a contract for "any specific thing addressed in these policies and procedures." [Record No. 53-3, p. 4] This alone likely defeats Count I under any theory the plaintiff pursues. *See Furtula*, 438 S.W.3d at 309 ("[W]hen the recipient of a statement is informed that the maker of the statement does not intend to enter into a contract . . . the formation of a contract will not be implied.").

That said, it is worth noting that Dale's response to the pending motion only asserts an implied contractual right to a promotion, which he claims was violated when the City failed to

promote him in accordance with its customary seniority-based practices. [Record No. 53, p. 11] In other words, he argues that the City violated § 1981 by adhering to the Handbook's policies, rather than by ignoring them. But the Disclaimer states that "[t]he City may change, forego or deviate from these policies and procedures, or any provision within, at any time and for any reason." [Record No. 53-3, p. 4] It clearly follows that the City did not view its actions regarding matters covered in the Policy, such as positional vacancies, to create a contractual right for City personnel.

Finally, it is worth noting that courts applying Kentucky law to at-will employment relationships outside the § 1981 context have found that such relationships do not create enforceable contracts. *See*, *e.g.*, *Clemans v. Nat'l Staffing Sols., Inc.*, 459 F. Supp. 3d 842, 845 (E.D. Ky. 2019) ("[A]n agreement for at-will employment does not create an enforceable contract, and thus, a breach of contract action to enforce it will not lie."); *accord Zieger v. Carl Zeiss Vision, Inc.*, No. 18-198-DLB-CJS, 2020 WL 1317477, at *3 (E.D. Ky. Mar. 20, 2020); *Murton v. Android Indus.-Bowling Green, LLC*, No. 1: 13CV–00112–GNS–HBB, 2015 WL 3549817, at *5 (W.D. Ky. June 4, 2015). And the plaintiff points to no state law in support of his position that he can establish a sufficient contractual relationship, implied or otherwise.

Based on the foregoing, Dale has not shown the existence of a contractual relationship under Kentucky law. And because his § 1981 claims require a contractual relationship, Count I will be dismissed in its entirety.

The Court briefly notes that the City's only other specific § 1981 argument, which concerns the hostile work environment claim, would also justify dismissal of that particular basis for relief. [Record No. 42, pp. 11-12] To establish a section 1981 claim for a racially hostile work environment, a plaintiff must show that: (1) he "belonged to a protected group";

(2) he "was subject to unwelcome harassment"; (3) "the harassment was based on race"; (4) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment"; and (5) "the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (*citing Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999)).  Notably, "only harassment *based on the plaintiff's race* may be considered." *Id.* (emphasis in original) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000)).  Thus, any racist comments regarding individuals of Middle Eastern or Indian descent are irrelevant.

Whether harassment is sufficiently "severe or pervasive" for a hostile work environment claim depends on factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 512 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  And none of these factors favor Dale, who continues to work for the Electric Department and maintains a professional relationship with his coworkers, including Sparkman.  Relatedly, "[o]ccassional offensive utterances," such as the slur used by Biddle in the plaintiff's presence on one occasion, "do not rise to the level required to create a hostile work environment." *Id.* at 512-13 (citing *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)).  Thus, while the City raises other potentially valid points concerning the merits of the hostile work environment claim, these reasons certainly warrant dismissal independent of the plaintiff's failure to prove the existence of a contractual relationship.

### B.  Title VII and KCRA Claims (Counts II, IV, and V)

### 1.  Failure to Exhaust Administrative Remedies for Certain Title VII Theories of Relief (Count II)

The City argues that Dale did not exhaust certain Title VII theories of recovery, namely, those concerning the April 2020 Last Chance Agreement, as well as the early 2021 foreman-promotion issue.  [Record No. 42, pp. 12-13]  Dale counters by contending: (a) these theories of recovery are directly related to those raised to the EEOC when Dale obtained the right-to-sue letter as continuing violations; and (b) EEOC exhaustion is a non-jurisdictional claim processing requirement that the defendants have waived by failing to raise the issue when he moved to amend the Complaint in April 2021.  [Record No. 53, pp. 14-15]

"It is well settled that a plaintiff must satisfy two prerequisites before filing a Title VII action in federal court: (1) timely file a charge of employment discrimination with the EEOC; and (2) receive and act upon the EEOC's statutory notice of the right to sue ('right-to-sue letter')."  *Granderson v. Univ. of Michigan*, 211 F. App'x 398, 400 (6th Cir. 2006) (citing *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1486 (6th Cir. 1989)).  Title 42 of United States Code, section 2000e-5(e)(1), provides the applicable time limitations for submitting such a charge to the EEOC.

> In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days.  A claim is time barred if it is not filed within these time limits.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (summarizing the requirements of 42 U.S.C. § 2000e-5(e)(1)).  The term "practice" in this context "appl[ies] to a discrete act or single 'occurrence,' even when it has a connection to other acts."  *Id.* at 111.

- 22 -

"[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180 – or 300– day time period after the discrete discriminatory act occurred." *Id.* at 113.

The Sixth Circuit, however, allows Title VII claims "for unlawful employment practices, even those not in [an] EEOC charge, if 'the scope of the EEOC investigation' would be 'reasonably expected' to 'prompt the EEOC to investigate [those] different, uncharged claim[s].'" *Watson v. Ohio Dept. of Rehab. & Corr.*, 690 F. App'x 885, 889 (6th Cir. 2017) (quoting *Weigel v. Baptist Hosp.*, 302 F.3d 367, 380 (6th Cir. 2002)).  "[R]etaliation claims are typical because 'retaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to defendants.'" *Id.* (quoting *Weigel*, 302 F.3d at 380).  Further, this "expected scope of investigation" test applies to prospective acts such that "a plaintiff [may] bring a claim in court for an act that occurred any time after the EEOC charge's . . . lookback even if he did not include that discrete act in the EEOC charge, so long as that act would be reasonably expected to fall within the scope of the original investigation." *Id.* at 890 (emphasis omitted) (citing *Delisle v. Brimfield Twp. Police Dept.*, 94 F. App'x 247 (6th Cir. 2004)).

Here, the plaintiff's charge to the EEOC contested the alleged discriminatory application of the Policy in August 2019.  The charge is dated March 20, 2020, prior to the April 2020 disciplinary incident.  However, the First Amended Complaint includes factual allegations that the punishment for this incident was retaliatory, even if Count II, unlike Count V's KCRA retaliation claim, does not actually allege retaliation.  [*See* Record No. 30, ¶¶ 71-73, 90-95.]  More significantly, the Last Chance Agreement punishing Dale in April 2020

explicitly listed the August 2019 suspension (in addition to the bucket lift incident) as a basis for his punishment. Without any indication to the contrary, this incident would appear to fall within the "expected scope of investigation" of the August 2019 incident such that Dale may proceed with a Title VII discrimination claim premised on the April 2020 incident even if he did not submit an EEOC charge that addressed it.

But the 2021 foreman-promotion incident is a different matter. It occurred more than a year after the August 2019 suspension, and Dale provides no argument that it would fall within the expected scope of investigation of the August 2019 suspension incident. Further, the Supreme Court has observed that failure-to-promote claims are generally discrete acts requiring EEOC charges.[6] *See Morgan*, 536 U.S. at 114. As a result, the Court declines to find that the EEOC charge in this case -- which did not account for racial discrimination premised on a failure-to-promote theory -- can account for a Title VII claim based on such allegations.

---

[6] Dale asserts that, "if an employee files a [*sic*] EEOC charge while at least on [*sic*] act constituting the hostile work environment is still timely, then the whole period of the hostile work environment can be considered." [Record No. 53, p. 14] It is true that "[a]ll of the acts that comprise a claim for hostile work environment, 'including those that would otherwise fall outside of the filing period,' are deemed timely if one of those acts occurred within the limitations window." *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 258 (6th Cir. 2014) (quoting *Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 782 (6th Cir.2005)); *see also Morgan*, 536 U.S. at 115-21. But the EEOC charge at issue here did not assert a hostile work environment claim. It is primarily premised on the August 2019 suspension and the alleged discriminatory enforcement of the Policy. It mentions that other crew members have made derogatory racial remarks in Dale's presence but asks that the EEOC "accept the above facts as a charge of discrimination." [Record No. 42-9, p. 3] Count II accordingly only purports to bring a Title VII claim for racial discrimination and, unlike Count I, does not mention a hostile work environment. In other words, the plaintiff has not raised a Title VII hostile work environment claim, and he cannot use such a theory to work around his failure to exhaust a claim premised on the Electric Department's foreman-promotion procedure in 2021.

The Court will consider whether the City has forfeited or waived the administrative exhaustion requirement as it pertains to a failure-to-promote Title VII claim. The "administrative exhaustion requirement is a claim processing rule and, therefore, is 'subject to forfeiture' by the defendant'" when it is not raised in a timely manner. *George v. Youngstown State Univ.*, 966 F.3d 446, 469 (6th Cir. 2020) (quoting *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1851-52 (2019)). Dale overlooks that the Answer to the original Complaint raised failure to exhaust administrative remedies and failure to comply with Title VII conditions precedent as affirmative defenses. [Record No. 4, pp. 15, 18] The Answer to the recently-filed First Amended Complaint, which contained the failure-to-promote allegations, likewise raises these same defenses. [Record No. 31, pp. 15, 18] The City now raises the exhaustion issue in connection with its motion for summary judgment.

Dale cites no caselaw in support of his position that the City has not raised this defense in a timely manner so as to forfeit or waive it. To the contrary, it would appear that the City's decision to raise this issue in multiple pleadings and at summary judgment is sufficient, particularly in light of the fact that the failure-to-promote theory was a recent addition to this lawsuit. *See Cannon v. Canteen Servs. of N. Michigan*, 657 F. App'x 438, 440 (6th Cir. 2016) (agreeing with the district court's conclusion that the defendant did not waive or forfeit an administrative exhaustion defense where the defendant did not plead the defense and instead raised it during dispositive motions briefing because "[the] claim was not injected into the proceedings until midway through the litigation.").

Accordingly, the Court concludes that the administrative exhaustion requirement does not bar Count II insofar as it asserts a Title VII claim for racial discrimination premised on the April 2020 disciplinary incident and Last Chance Agreement. However, the

failure-to-promote allegations of the First Amended Complaint fall outside the EEOC charge's expected scope of investigation, and the plaintiff offers no law in support of his argument that the City has waived or forfeited a Title VII exhaustion defense to such allegations.  Thus, Dale will be precluded from proceeding with a failure-to-promote claim under Title VII.[7]

### 2.  Title VII and KCRA Hostile Work Environment Claims

Next, the City argues that the plaintiff was not subjected to a hostile work environment under Title VII or the KCRA.  [Record No. 42, pp. 13-14]  As noted above, Dale does not actually maintain a Title VII hostile work environment claim – Count II only alleges a claim for racial discrimination.  Similarly, Counts IV and V allege KCRA violations for racial discrimination and retaliation, respectively.

Notwithstanding this point and any Title VII exhaustion issues, the same analysis governs § 1981, Title VII, and KCRA hostile work environment claims.  *E.g.*, *Singleton v. Select Specialty Hospital-Lexington*, No. 5:07–230–JMH, 2009 WL 192577, at *7-8 (E.D. Ky. Jan. 27, 2009).  Thus, any KCRA or Title VII hostile work environment claims fail for the

---

[7] Dale's December 3, 2021 response to the instant motion asserts that he will submit an EEOC charge regarding the 2021 promotion, but such action would appear to be futile.  Although the exact date of Steele's promotion is not entirely clear from the evidence, it occurred prior to Dale's April 5, 2021, motion to amend the Complaint, which sought to add the failure-to-promote allegations, and the First Amended Complaint states that he was promoted on March 4, 2021.  [*See* Record No. 30, ¶ 80.]  The limitations period only "expands to 300 days when the plaintiff is deemed to have 'initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice.'"  *Jones v. Fed. Express Corp.*, 952 F.3d 815, 818 (6th Cir. 2020) (quoting 42 U.S.C. § 2000e-5(e)(1)).  Dale was required to submit a new charge within 180 days of the promotion because he did not institute proceedings with such an agency.  He has offered no evidence that he has submitted a new EEOC charge, but even if he did on the date of his response, the submission would fall outside the limitations period.

same substantive reasons that the § 1981 hostile work environment claim fails.  Thus, to the extent Dale alleges such claims, they will be dismissed.

### 3.  Title VII and KCRA Racial Discrimination Claims (Counts II and IV)

The City argues that the Title VII and KCRA racial discrimination claims contained in Counts II and IV fail on the merits because Dale cannot establish a prima facie case of racial discrimination.  [Record No. 42, pp. 14-16]  "The Kentucky Civil Rights Act, K.R.S. § 344.040, mirrors Title VII of the Civil Rights Act of 1964, and discrimination claims brought under the KCRA are analyzed the same way as those brought under Title VII."  *Beatty v. Frito-Lay, Inc.*, 429 F. Supp. 3d 342, 347 (E.D. Ky. 2019) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000)).  The parties agree that the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to these claims.  [Record Nos. 42, p. 14 and 53, pp. 15-16]

Under the first step of the *McDonnell Douglas* approach, a plaintiff asserting a racial discrimination claim must establish a prima facie case by showing: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted).  In the failure-to-promote context, the following prongs govern the prima facie case: "(1) [the plaintiff] is a member of the protected class; (2) [he] applied for and was qualified for a promotion; (3) [he] was considered for and was denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied."  *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812-13 (6th Cir. 2011) (citations

omitted). Dale's burden in proving a prima facie case is "not onerous" and "easily met." *Id.* at 813 (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000)).

The City points to *Offutt v. Warren Cnty. Reg. Jail*, 109 F. App'x 740 (6th Cir. 2004) (per curiam), in support of its position that the plaintiff cannot establish prima facie discrimination claims.    [Record No. 42, pp. 15-16] In *Offutt*, the plaintiff was a "Sergeant/Training Officer" in charge of the county jail's main control consol. *Offutt*, 109 F. App'x at 741-42. She "admitted to writing two notes for which the Jail could have fired her, lied twice to her supervisor about being the author of the notes, and had several accusations against her of improper conduct toward co-workers." *Id.* at 742. The plaintiff had a verbal altercation with her trainee Deputy, after which her supervisor, the jailer, "informed Offutt that she was demoted and would have to work two additional days without pay." *Id.* at 741. The jailer fired her when the plaintiff refused. *Id.* The jailer did not punish the trainee, inasmuch as she concluded that he had "made his remarks" during the verbal altercation "out of frustration." *Id.* at 742. Offutt, who was black, sued, bringing, *inter alia*, Title VII and KCRA racial discrimination claims and alleging that the jail "did not similarly discipline white employees." *Id.* at 741-42.

The district court held that the plaintiff failed to establish a prima facie case because the plaintiff and the comparator deputy were not similarly situated and the Sixth Circuit agreed. *Id.* at 742-43. In reaching this conclusion, the appellate court described the "similarly situated" standard as follows:

> Similarly situated means employees who have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. The comparable

employees must be similarly situated in all relevant aspects, although an exact correlation is not required.

*Id.* at 742 (internal citations and quotation marks omitted).  The court observed that the "clear division in responsibilities" made the plaintiff sergeant and the trainee deputy "dissimilar."  *Id.* The court also noted that the "material difference in personnel history" between the plaintiff and the new trainee, who lacked an adverse disciplinary record, precluded them from "being comparators."  *Id.* at 742-43.

Dale asserts that *Offutt* is inapposite.  [Record No. 53, pp. 16-17]  Regarding his disciplinary racial discrimination allegations, Dale contends that he has been subjected to harsher punishment than his white peers and that he has produced evidence that he observed white peers violate the Policy without punishment.  [*Id.* at p. 17.]  He also points out that in contrast to *Offut*, his supervisor has now conceded that he did not violate the Policy.  [*Id.*]  As for his failure-to-promote allegations, Dale claims that his white peers were promoted on multiple occasions "without a job posting, application form, examination, or interview."  [*Id.* at p. 16.]  He also claims that Hunt and Steele, white coworkers, "were afforded the opportunity to apply for a [foreman] position although they were not the most senior lineman" and that he would have gotten the position but for his race.  [*Id.* at p. 17.]

Viewing the evidence in the light most favorable to the plaintiff, Dale did not violate the Policy.  Notwithstanding this point, he has not identified any similarly situated employee who has been treated differently by the City for conduct similar to that of the July 2019 incidents, *i.e.*, the failure to wear appropriate PPE while working while working around energized conductors.  The plaintiff has only identified one individual who has engaged in similar conduct – Sparkman.  But Sparkman is not a similarly situated comparator.  He is the

superintendent of the Electric Department and would have, at the time, answered to Jordan, the city manager.  Moreover, there is no indication that Sparkman's conduct was reported to Jordan or any other City personnel who could discipline him.  And while Sparkman has written-up other white Electric Department employees (Noel, Kelly, and Steele) without suspending them, none of the infractions were similar to the July 2019 PPE incidents.

Noel, however, can serve as a comparator for the April 2020 disciplinary incident.  He was disciplined for his role in that incident but received only a written reprimand on account of his lack of a disciplinary history.  The only disciplinary history relevant to this incident as far as Dale is concerned is the suspension for a violation of the Policy, and Sparkman has now admitted that Dale did not commit such a violation.  This essentially puts Noel and Dale on equal disciplinary footing.  It is true that Noel was a recently-hired groundsman (rather than a long-tenured lineman) but there is evidence to suggest that Dale was not a *per se* supervisor of Noel and that both employees were of sufficiently equal rank to be held responsible for the incident.  Thus, the Title VII and KCRA racial discrimination claims will be dismissed insofar as they are premised on August 2019 suspension because Dale has not offered a similarly situated comparator.  They will not be dismissed to the extent they concern the April 2020 incident.

Dale has not exhausted his Title VII claim as it relates to his failure-to-promote theory, but the KCRA failure-to-promote racial discrimination claim remains.  The City again argues that there were no similarly situated comparators.  [Record No. 42, pp. 15-16]  Specifically,

the City points out that the evidence suggests that Steele "had qualitatively different experience than Dale" when he was interviewed and hired for the promotion.[8]  [*Id.* at p. 16.]

Notably, the City fails to cite to any caselaw justifying its argument in the failure-to-promote context.  And as stated, the prima facie case involves consideration of whether an individual outside the protected class with "similar qualifications" to the plaintiff received a promotion.  "Similar qualifications" does not mean identical qualifications.  *See Provenzano*, 663 F.3d at 814 ("Requiring a plaintiff to show identical qualifications to another individual is not realistic from a human standpoint.").

Along these lines, courts have found circumstances where two candidates were offered an interview sufficient to create a genuine issue of material fact regarding whether they had relatively similar qualifications.  *Meyrose v. Vitas Hospice Servs., LLC*, No. 19-91-DLB-CJS, 2021 WL 5139478, at *10 (E.D. Ky. Nov. 3, 2021) (citing *Walls v. Johnson*, 229 F. Supp. 3d 678, 686 (E.D. Tenn. 2017)).  And while Steele may have had prior work experience better suited to the supervisory role of a foreman, Dale had worked for the Electric Department for 10 years more than Steele and also had a longer tenure as a Class A lineman.  In other words, they each had substantial qualifications for the promotion.  Thus, the Court finds that sufficient evidence of a prima facie case exists for the KCRA claim premised on the 2021 promotion to proceed.  *See id.*; *see also Cline*, 206 F.3d at 661 ("On a motion for summary judgment, a

---

[8]    The City also notes that "Dale's annual [performance] evaluations revealed ongoing concerns related to his failure to adhere to safety protocols."  [Record No. 42, p. 16]  But viewing the evidence in the light most favorable to the plaintiff, these evaluations do not appear to have impacted the foreman selection process.  As noted, Morton indicated during her deposition that the decision to hire Steele was premised on his prior work experience as communicated during his interview.  Further, the evidence suggests that the interview panel did not consider the candidates' personnel or training files.

district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.")

Ordinarily, the prima facie case does not end a *McDonnell Douglas* analysis. If the plaintiff demonstrates a prima facie case, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White*, 533 F.3d at 391 (citations omitted). And "if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* at 391-92 (citations omitted). But the City does not mention, let alone contest, the second and third steps of the *McDonnell Douglas* analysis.

Thus, the plaintiff's Title VII and KCRA racial discrimination claims relating to the April 2020 disciplinary incident will proceed, as well as the KCRA racial discrimination claim premised on the foreman promotion in 2021. *See Strickland v. Acevedo Rests., Inc.*, No. 2:11-cv-2566-RMG, 2014 WL 798402, at *2, 11 (D.S.C. Feb. 27, 2014) (denying motion for summary judgment where plaintiff established prima facie case and defendant failed to raise "legitimate reasons" or "pretext" arguments); *see also Taher v. Wichita State Univ.*, 526 F. Supp. 2d 1203, 1217-19 (D. Kan. 2007) (solely addressing the defendant's "similarly situated" prima facie case argument in its *McDonnell Douglas* analysis after noting that the defendant did not argue "pretext"). Counts II and IV will otherwise be dismissed.

### 4. Retaliation Under the KCRA (Count V)

The City also challenges the KCRA retaliation claim alleged in Count V. [Record No. 42, pp. 16-17] Section 344.280(1) of the KCRA prohibits "retaliat[ion] or discriminat[ion] in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated

in any manner in any investigation, proceeding, or hearing under this chapter."  Like discrimination and hostile work environment claims, KCRA retaliation claims are generally interpreted "consonant with federal interpretation" of Title VII's retaliation provisions.  *E.g.*, *Douglas v. Cty. of Richmond*, No. 5:09-175-JMH, 2009 WL 3447285, at *3 (E.D. Ky. Oct. 22, 2009) (citations omitted).  The parties again agree that the *McDonnell Douglas* framework applies to the retaliation claim.  [*See* Record Nos. 42, p. 16 and 53, 17-19.]

A prima facie case for unlawful retaliation requires the employee to establish that: "(1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action."  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (citing *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)).  As in the racial discrimination context, the burden shifts to defendant to produce evidence of a "legitimate, nondiscriminatory reason" for its conduct and then shifts back to the plaintiff to produce "evidence that the legitimate reason offered by the employer was in fact only a pretext designed to mask retaliation."  *Id.* (citations omitted).  And again, the City appears to contest Dale's prima facie case, inasmuch as it solely cites law pertaining to the fourth "causal connection" prong, as well as the general requirements of the prima facie case.  [*See* Record Nos. 42, pp. 16-17 and 56, pp. 6-7.]  In other words, it does not argue the first three prongs of the prima facie case or the second or third steps of the *McDonnell Douglas* analysis.

Specifically, the City asserts that there is no causal connection between Dale's protected legal filings and his discipline in April 2020.  [Record Nos. 42, pp. 16-17 and 56, pp. 6-7]  The City argues that the Last Chance Agreement resulted from Dale's failure to wear

appropriate PPE and misconduct in April of 2020, rather than his December 19, 2019, letter purporting to be a grievance or his March 20, 2020, EEOC charge. [*See* Record Nos. 42, pp. 16-17 and 56, p. 6.] The City notes that five months passed between the submission of the letter and the Last Chance Agreement, while also pointing out that Noel, like Dale, was disciplined for the truck incident. [*Id.* at p. 17.] Dale counters that a sufficient nexus exists because the April 2020 Last Chance Agreement references the August 2019 suspension without pay and Sparkman has acknowledged that he did not actually violate the Policy.[9] [Record No. 53, p. 19]

"A causal connection between an employer's actions and a protected activity is established when the protected activity was the 'but-for' cause of the alleged adverse action by the employer." *Davis v. Metro Parks and Recreation Dep't*, 854 F. App'x 707, 714 (6th Cir. 2021) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "But-for causation can be established by proving that the employer treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Id.* (citing *Nguyen v. Cty. of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). That said, "[t]emporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Id.* (citing *Parnell v. West*, 114 F.3d 1188, 1997 WL 271751 (6th Cir. 1997) (unpublished table opinion)). Thus, a plaintiff

---

[9] Dale also posits that Sparkman, Morton, and Withrow "very likely" accounted for his disciplinary infractions when they were interviewing him for the foreman position because they were aware of his legal proceedings. [Record No. 53, p. 17] This argument is difficult to follow but regardless, it is entirely speculative. The record indicates that the interviewers did not consider the candidates' personnel or training files when assessing their suitability for the position. More significantly, he has not come forward with any evidence that there was a causal connection between his protected actions and the City's 2021 promotional decisions.

may satisfy the fourth prong of a prima facie retaliation claim if he can "couple temporal proximity with other evidence of retaliatory conduct." *Id.* (quoting *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

Here, Dale can show that he was treated differently than a similarly situated comparator for the reasons stated above, *i.e.*, he was similarly situated to Noel, who was subjected to lesser punishment. And Dale may also be able to show but-for causation with temporal proximity supported by other evidence. Assuming Dale's last protected activity prior to the April 17, 2020, discipline occurred when he submitted the EEOC charge on March 20, 2020,[10] the relevant events are temporally close. *See Parnell*, 1997 WL 271751, at *3 ("[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months") (collecting cases).

Further, as Dale indicates, the Last Chance Agreement was premised, in part, on the same incident underlying his purported grievance and the EEOC charge – his August 2019 suspension without pay. The Electric Department may have been able to issue the Policy, which authorizes Sparkman to suspend employees without pay for violation of its terms, under Part I(1) of the Handbook. But Parts I(5) and III(2) of the Handbook generally indicate that

---

[10]  Dale claims, without legal support, that his protected activities include: a discussion of the August 2019 suspension under the Policy with a member of the city commission, his attorney's December 19, 2019, letter to the City purporting to file a grievance, and this legal action (which presumably includes the filing of the EEOC charge on March 20, 2020). [Record No. 53, p. 18]  The City does not dispute these points, which pertain to the uncontested first and (potentially) second prongs of the prima facie case. At any rate, the City seems to tacitly acknowledge that the filing of the EEOC charge was a relevant protected activity, inasmuch as it asserts that there was no causal connection between it and the plaintiff's discipline. [*See* Record No. 58, pp. 6-7.]

suspensions without pay need approval from the city commission, and this requirement would seem applicable because Dale's conduct did not implicate the Policy.

Counsel's December 19, 2019, letter put the City on notice that the Policy might not have required him to wear a long-sleeved shirt during the work at issue. And Sparkman has admitted that Dale did not, in fact, violate the Policy. One could reasonably infer from these facts that Sparkman felt Dale might be successful in his attempts at legal recourse for the suspension, issuing the Last Chance Agreement and its corresponding 12-month probationary period as a retaliatory measure. This is not to say that Dale's actions in April 2020 did not themselves merit some form of discipline. But the evidence may reasonably support an inference that the specific mode and severity of the discipline was chosen in retaliation for Dale's protected legal activity.

The City cites no law in support of its position other than to state generalized propositions that a causal connection must exist and that there must be direct or compelling circumstantial evidence of such a connection. [Record No. 56, p. 7 (citing *Nguyen*, 229 F.3d at 566-567; *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).] Mindful that the inquiry at this stage is whether the plaintiff has produced sufficient evidence to create a genuine dispute of material fact regarding the first step of the *McDonnell Douglas* analysis, the Court concludes that the plaintiff has offered sufficient evidence of the fourth "causal connection" prong of the prima facie retaliation claim. Thus, Count V may proceed insofar as it asserts a retaliation claim premised on the April 2020 disciplinary incident.

### C. Section 1983 Procedural Due Process Claim (Count III)

The City next attacks the plaintiff's procedural due process claim, contending that Dale cannot establish a constitutionally protected property right in the promotion to foreman

- 36 -

because the Handbook treats seniority as a "tie-breaker" factor for promotions and "the proof does not establish that the City had ever informally adopted a practice of promoting based only on seniority." [Record No. 42, pp. 17-18] Dale responds by raising another implied contract argument and contending that he can establish a property right in the promotion based on the City's custom and practice of "promoting its most senior employees from lineman to crew chief and then to foreman." [Record No. 53, pp. 20-21]

> Plaintiffs asserting a § 1983 procedural due process claim must establish:
>
> (1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment . . . , (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest."

*Med. Corp. v. Cty. of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (alteration in original) (quoting *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)). Dale asserts that he was deprived of a protected property interest in a 2021 promotion to foreman, but his argument that he had an implied contract right creating such an interest fails because he has not demonstrated the existence of a contract, implied or otherwise, under Kentucky law. *See*, *e.g.*, *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

Still, "[t]he essential inquiry is whether there exists a mutually explicit understanding that supports the plaintiff's claim of entitlement" to the property interest he asserts. *Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017) (cleaned up) (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)). Such an understanding may not necessarily be coextensive with an

implied contract right.  *See, e.g.*, *Paskvan v. Cty. of Cleveland Serv. Comm'n*, 946 F.2d 1233, 1237 (6th Cir. 1991) (noting that an "implied contract *or* mutually exclusive understanding" can establish a constitutionally protected property interest) (emphasis added).

Moreover, Sixth Circuit caselaw on the matter suggests that the City may not be able to lean on compliance with the Handbook's vacancy-filling protocols for the 2021 foreman promotion.  On at least two occasions, the appellate court has found procedural due process claims to assert sufficient property interests where plaintiffs alleged that their municipal employers historically engaged in promotional practices differing from official policies, only to pass over the plaintiffs for promotions by using those policies.  *See Martinez v. Cty. of Cleveland*, 700 F. App'x 521, 522 (6th Cir. 2017) (unpublished memorandum opinion); *Paskvan*, 946 F.2d at 1236-37.  Thus, Dale may proceed by contending that the City waived reliance on its Handbook vacancy-filling provisions, creating instead a mutually explicit understanding that he would be promoted to foreman based on a practice of promoting individuals from within the Electric Department according to seniority.  *See Paskvan*, 946 F.2d at 1236-37.

Notwithstanding, this waiver theory of recovery "may be quite difficult to prove."  *Id.* at 1236.  Here, the evidence indicates that the Electric Department promoted Biddle to crew chief and then to foreman without resorting to the procedures of the Handbook.  The City has failed to produce any records concerning the promotion to crew chief, Morton testified that she could not recall whether that position was formally posted, and Sparkman acknowledged that there was no formal application process when he promoted Biddle to foreman.

However, Dale points to no evidence that promotions within the Electric Department were premised solely on seniority as a matter of general practice during the relevant time frame

such that there could be a mutually explicit understanding that senior employees would be promoted when vacancies arise. Morton testified that the City previously promoted individuals on the basis of seniority alone, but that this had not been the practice during her tenure as human resources director. She took that position in 2010 – more than ten years prior to Steele's 2021 promotion to foreman. Sparkman's own promotional history corroborates this testimony. He was promoted to foreman in 2011 or 2012 over a senior lineman, Wally Hunsinger. And although it is difficult to say how close Sparkman's promotions to foreman and superintendent tracked the procedures of the Handbook, it is notable that he had to interview for both positions.

Further, Dale relies only on Biddle's promotions as evidence of the practice he claims created a constitutionally protected property interest. [Record No. 53, pp. 20-21] Sparkman testified that he promoted Biddle to foreman based on his qualifications and conversations with Electric Department employees *in addition to* his seniority.[11] Moreover, these are only two promotions involving the same Electric Department employee. Dale points to no specific evidence demonstrating that the Electric Department routinely promoted employees on account of their seniority, and he similarly offers no testimony or evidence from other coworkers indicating that there was a common or widespread understanding that senior employees would obtain promotions as a matter of course.

Thus, while the City's past noncompliance with Handbook vacancy-filling protocols for Biddle's promotions may arguably waive reliance on the Handbook in this instance, the City is correct to argue that Dale has not proven the existence of an informal practice of

---

[11] The record does not indicate that qualifications are a proxy for seniority. For example, Steele may have had better qualifications for the foreman position than Dale based on his supervisory experience with other employers, even though Dale had worked far longer for the Electric Department.

seniority-based promotions.  And although Dale may have personally expected the 2021 promotion, "[u]nilateral expectations of a property interest are insufficient to trigger due process concerns."  *Wojcik v. Cty. of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001).  Count III will be dismissed because Dale has failed to demonstrate a mutually explicit understanding that senior Electric Department employees receive promotions as a matter of course.

### D.  State Law Tort Claims (Counts VI and VII)

#### 1.  Negligent Hiring, Retention, and Supervision Claims (Count VI)

Finally, the Court turns to Dale's tort claims.  The defendants (including Sparkman and Jordan) contend that the negligent hiring, retention, and supervision claims contained in Count VI should be dismissed because they did not negligently hire, retain, or supervise any employees who posed a foreseeable risk to the plaintiff.  [Record Nos. 42, p. 19 and 56, p. 8] Further, the defendants note that the First Amended Complaint's negligent hiring, retention, and supervision allegations are vague and do not "identify which employee the Defendants negligently hired, retained, or supervised and what tort this employee alleged committed against [Dale]."  [Record No. 42, p. 19]  The defendants assert that if this count concerns Biddle's use of a racial slur, it should be dismissed because the plaintiff did not inform Sparkman or any City personnel of this incident.  [*Id.*]  Dale responds by arguing that: (1) the City was negligent in promoting Sparkman to foreman and then to superintendent when it had notice of his prior disciplinary incidents; (2) Jordan was negligent in allowing Sparkman to promulgate the Policy and issue the suspension.  [Record No. 53, pp. 20-21]

Kentucky law "recognizes that an employer can be held liable when its failure to exercise ordinary care in hiring or retaining an employee creates a foreseeable risk of harm to a third person."  *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. Ct. App. 1999).

Similarly, "an employer may be held liable for the negligent supervision of its employees 'only if he or she knew or had reason to know of the risk that the employment created.'" *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. Ct. App. 2013) (quoting *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003)).

The Court agrees that Count VI is particularly vague. The only material allegations that provide any clue of its substance are those asserting: (1) the defendants knew or should have known that unidentified Electric Department employees had a "propensity for unlawful racially harassing and age harassing behavior"; and (2) they negligently hired, retained, or supervised these employees who were allowed to commit these wrongful acts.[12] [Record No. 30, ¶¶ 117-119] Giving Dale the benefit of the doubt, the Court will address the two bases for relief he asserts in his response to the motion for summary judgment through the lens of the race-based allegations in Count VI.

Neither of these grounds for relief concern Sparkman's hiring, retention, or supervision of any employee. Thus, Count VI will be dismissed to the extent it is alleged against Sparkman. Similarly, Dale's theories of relief do not respond to the City's argument concerning the racial epithet used by Biddle. Regardless, the plaintiff did not inform any City personnel about this incident, and there is no evidence to suggest that anyone should have reasonably foreseen that Biddle would use such a term. Thus, Count VI will be dismissed insofar as it claims that the defendants negligently hired, retained, or supervised Biddle or any other Electric Department employee who used racial slurs.

---

[12] The "age harassing behavior" allegation is perplexing, inasmuch as Dale does not contend that he was the subject of age-based discrimination.

Dale's theory concerning the promotion of Sparkman is a nonstarter. Sparkman's prior disciplinary incidents are primarily safety-related, the one exception being the time he left his phone on silent. They say nothing about his alleged propensity to discriminate against African Americans.

And Dale's theory concerning Sparkman's implementation of the Policy and his suspension is similarly unavailing. There is no evidence that implementation of the Policy was racially motivated. Assuming, *arguendo*, that Sparkman's purportedly Policy-based suspension of Dale was racially motivated, there is no evidence to suggest that Jordan or any other City personnel should have reasonably anticipated that Sparkman would discriminate against any employee on the basis of race. Even if one *charitably* reads Dale's argument to claim that Jordan negligently retained or supervised Sparkman when he upheld the suspension after receiving the December 2019 letter from counsel, that letter did not claim that the suspension was discriminatory.

In short, there is no evidence that any City personnel should have reasonably foreseen racially discriminatory conduct from Electric Department employees, which is all that is alleged in Count VI. Accordingly, Count VI will be dismissed in its entirety.

### 2. Negligent Infliction of Emotional Distress (Count VII)

Lastly, the defendants contend that the plaintiff's NIED claim fails because, *inter alia*: (1) he has not proven a breach of a duty of care; (2) he has not experienced sufficiently severe emotional distress; and (3) he has no expert to testify about the severity of his alleged injuries or whether they were caused by the defendants' conduct. [Record Nos. 42, p. 20 and 56, pp. 8-9] Dale argues that the defendants owed him a general duty of care to protect him from "unfair treatment" and that the Handbook itself created a duty to treat him in accordance with

its provisions. [Record No. 53, p. 22] He claims that the defendants breached this duty of care when they allowed him to be suspended without pay and "fail[ed] to implement the polices [*sic*] and procedures for promotion when he was a qualified applicant." [*Id.*] He also posits that the severity of his symptoms should be an issue left for the jury, although he fails to acknowledge the defendants' expert argument and only relies on his own affidavit to establish proof of his symptoms. [*Id.* at pp. 22-23.]

NIED claims are "analyzed under general negligence principles," meaning that a plaintiff must establish the "recognized elements of a common law negligence claim": "(1) the defendant owed a duty of care to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88-89 (Ky. 2003)). Dale offers no support for his assertions that the defendants' alleged conduct breached duties of care recognized under Kentucky law, which may be sufficient to defeat his claim.

Regardless, "recovery should be provided only for 'severe' or 'serious' emotional injury," which "occurs where a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case." *Id.* (citations omitted). And Dale must show that he "suffered mental stress or an emotional injury, acknowledged by medical or scientific experts, that is greater than a reasonable person could be expected to endure given the circumstances." *Id.* at 6; *accord Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 35-36 (Ky. 2017) (observing that *Osborne* imposes a "heightened proof requirement" of expert testimony for NIED claims). The severity of mental or emotional anguish may generally be a jury question, but summary judgment is appropriate when a

- 43 -

plaintiff fails to offer expert testimony on the issue. *See*, *e.g.*, *Gregory v. Burnett*, 577 F. App'x 512, 520 (6th Cir. 2014) (per curiam). Here, Dale has not offered expert proof of the severity of his alleged mental and emotional injuries. Accordingly, Count VII will be dismissed.

## IV. Conclusion

Based on the foregoing analysis and discussion, the following claims asserted by Dale against the City survive summary judgment: (a) Title VII racial discrimination premised on the April 2020 disciplinary incident (Count II); (b) KCRA racial discrimination premised on the April 2020 disciplinary incident and 2021 foreman promotion (Count IV); and (c) KCRA retaliation premised on the April 2020 disciplinary incident (Count V). All other claims asserted by the plaintiff against the City, Sparkman, and Jordan will be dismissed.

Accordingly, it is hereby

**ORDERED** as follows:

1.      The defendants' motion for summary judgment [Record No. 42] is **GRANTED**, in part, and **DENIED**, in part.

2.      Plaintiff Corbin Dale's claims against Defendant City of Paris for Title VII racial discrimination premised on the April 2020 disciplinary incident, KCRA racial discrimination premised on the April 2020 disciplinary incident and 2021 foreman promotion, and KCRA retaliation premised on the April 2020 disciplinary incident remain pending. All other claims are **DISMISSED**.

4.      Defendants Aaron Sparkman and Daron Jordan are **DISMISSED** from this action.

5.     This matter is scheduled for a pretrial conference on **Friday, February 11, 2022**, beginning at the hour of **9:00 a.m.**, at the United States Courthouse in Lexington, Kentucky.  Counsel and the parties are directed to be attend.

Dated:  January 10, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky